# Family Court of the Navajo Nation

### Judicial District of Tuba City, Arizona

---

**Edison Burnside, Plaintiff,**

v.

**Genevieve Burnside, Defendant.**

**Decided October 19, 1990**

---

## ORDER

Judge Wayne Cadman, Sr. presiding.

This matter having come before the Court on June 7, 23 and 24, 1988 for final hearings with the plaintiff represented by Gary LaRance, and the defendant represented by Timothy Joe and subsequently Steven Boos of the Mexican Hat D.N.A., the Court upon review of the oral testimony and physical evidence presented, hereby finds:

## FINDINGS OF FACT

1. This matter stems from a Petition for Modification of Child Custody, Contempt, and Accounting filed by the plaintiff on February 23, 1987.

2. Plaintiff and defendant stipulated to A) the Court's continuing Jurisdiction as it arises from a Divorce Decree issued on February 20, 1985, B) that the physical custody of the three minor children were awarded to the defendant, and C) that the plaintiff was granted visitation rights.

3. The Court further took Judicial notice of A) the Order for Pendente Lite visitation of December 5, 1984 issued by the Honorable Robert Walters, B) the Marital Settlement Agreement which was incorporated into the February 20, 1985 Divorce Decree issued by the Honorable Robert Walters, C) the October 31, 1986 Order issued by the Honorable Evelyn Bradley, D) the December 1, 1986 Attachment Order issued by the Honorable Evelyn Bradley, and E) the August 4, 1987 Order issued by the Honorable Wayne Cadman, Sr.

4. The minor children at issue in this cause of action are: Shannon Burnside, DOB: 05/28/76, C#619,435; Tom Burnside, DOB: 10/19/79, C#623,282; and Rochelle Burnside, DOB: 09/20/81, C#625,896.

5. The Marital Settlement Agreement established a savings account in the amount of $5,000.00 with the Valley National Bank in Page, Arizona under Account # 31337968 for the sole use of the minor children for their education and in case of emergencies with all withdrawals to be consented to by both parties.

6. Shannon Burnside is a thirteen year old Navajo child who presently resides with her siblings, natural mother Genevieve (Burnside) Black, and stepfather Roy Lee Black in Shonto, Arizona. She is enrolled with the Kayenta Unified

School District and is in the seventh grade.

7. Tom Burnside is a ten year old Navajo child who also resides with his siblings, natural mother and stepfather in Shonto, Arizona and is enrolled with the Shonto Boarding School and is in the fourth grade.

8. Rochelle Burnside is an eight year old Navajo child who also resides with her siblings, natural mother and stepfather in Shonto, Arizona and is enrolled with the Shonto Boarding School and is in the second grade.

9. Genevieve (Burnside) Black is a thirty-three years old Navajo mother who was previously married to Edison Burnside and was divorced on February 20, 1985. Mrs. Black is presently employed with the Shonto Boarding School and has been for the past thirteen years. She has been with Facility Maintenance since February 1988 with an income of $7.50 per hour with forty hour work week and works from 8:00 A.M. to 5:00 P.M. daily. Mrs. Black presently resides with her three children from her marriage to Edison Burnside, her two children from Roy Lee Black, who are three and two years old, and her husband in a three bedroom government house in Shonto, Arizona. Mrs. Black is a member of the Native American Church and is a member of the Board of Directors from District 8 of the Association.

10. Roy Lee Black is a thirty-three years old Navajo male married to Genevieve Black from Long House Valley. Mr. Black presently resides with Genevieve Black, the three Burnside children, and his two children from his present marriage in Shonto, Arizona. Mr. Black is presently employed by Peabody Coal Company and earns an income of $16.65 per hour with an average of thirty-six hour work week. Mr. Burnside met Genevieve Black in September of 1984 and were married on October 20, 1986.

11. Edison Burnside is thirty-seven years old and is the natural father of Shannon, Tom, and Rochelle Burnside. Mr. Burnside presently resides in Page, Arizona and is employed by Peabody Coal Company at the Black Mesa Mine as an Electrician and earns an income of $18.17 per hour with an average work week of forty hours. He works from 12:00 midnight to 8:00 A.M. Mr. Burnside presently resides with Gracie Bileen at his trailer in Page, Arizona.

12. Edison Burnside has an Associate of Arts Degree in Electronics and resides in a two bedroom trailer in Page, Arizona and that photographs of the interior show that the trailer is well furnished with expensive pieces of furniture.

13. Gracie Bileen is a thirty-six year old Navajo woman with four children, the oldest being twenty-three years and the youngest being six years old. The oldest daughter is presently caring for her three siblings in Teec Nos Pos, Arizona and does not live with her and Edison Burnside. Ms. Bileen met Edison Burnside in 1987 and began cohabitating with him since 1987. She is presently employed by two restaurants in Page, Arizona.

14. Kathryn Tsosie of Chinle Navajo Division of Social Welfare Office submitted a written Social Investigation on June 6, 1988 listing her interviews, findings and six recommendations to the Court.

15. The Social Worker defined the "Alignment Principle" as one parent aligning a child's thoughts and actions to diminish relations with the other parent.

16. Edison Burnside, since December 14, 1984 to the most recent attempted visitation on August 14, 1988, has made approximately 14 attempted visitations only to be informed by Mrs. Black that the children did not wish to see him, and she would not force them to see him.

17. It is apparent that the parties had bitter feelings toward each other during the divorce and that these feelings continued after the divorce. These feelings are evidenced by arguments ensuing between the parties during visitations and at times in front of the children.

18. These arguments often stem from the time when the parties separated in July of 1984 when Mr. Burnside had the electricity disconnected and took a washing machine and other household items. At this time, the children were eight, four and two years old respectively. Police officers were sometimes called for assistance when the parties began arguments or disputes over visitation by the plaintiff which often resulted in the plaintiff being advised to take the matter back to Court.

19. Since Mrs. Black has two younger daughters by her present marriage, a baby-sitter comes daily when the Blacks are working until she returns after 5:00 P.M. The three Burnside children are normally in school from 8:30 A.M. to 3:30 P.M. daily.

20. The Blacks have stressed the importance of Navajo traditions and culture and presently teach them to the Burnside children and their own children. At times, the children are taken to their grandparents home to visit and herd sheep.

21. The Burnside children have accepted Roy Lee Black as their father and refer to him as "father" and "daddy," and their relationship is good. Mr. Black also provides for the family needs and attends parent meetings held at the school for the Burnside children.

22. During the visitations made by Edison Burnside, the children became disturbed and frightened and refused to see their natural father. These fears were often aggravated by the presence of police officers called for assistance by the defendant and by the arguments and verbal confrontations.

23. The observations by the relatives of Genevieve Black, the Burnside children's teacher, and the Social Worker in her report all indicated that Mrs. Black was a caring mother and provided for the needs of the children.

24. Edison Burnside never hurt the children during their marriage, aside from normal spanking for discipline.

25. Edison Burnside indicated that if the children are placed in his home, his working hours would not conflict with being away from the children as they would be asleep from midnight to the early morning hours. Gracie Bileen would be available to see them off to school. Mr. Burnside stated that he planned to enroll the children in the Page Public Schools.

26. Mrs. Black's criminal history reflects only two convictions for speeding

with the most recent offense in May of 1984. Mr. Burnside's criminal history record reflects ten convictions for speeding and one pending with the most recent case being in October 1989.

27. On September 13, 1985, Genevieve Black withdrew $5,076.72 from the Valley National Bank in Page, Arizona which was to be used for the education of the children and for emergencies as stipulated in the Marital Settlement Agreement, and without the consent of the plaintiff. Mrs. Black alleges to have deposited the money into the Coconino Federal Credit Union in Flagstaff, Arizona but refuses to specify the amount or account number. Some of the money was also alleged to have been used for clothing purchases for the children, but Mrs. Black failed to produce any receipts or supply an itemized accounting with amounts to the present date, even though an Interim Order of July 27, 1988 ordered Mrs. Black to: A) disclose how the money was used upon withdrawal; and B) show the current balance on deposit at Coconino Credit Union no later than July 8, 1988.

28. The first attempts at visitation by the plaintiff were on December 14, 1984 and December 21 - 25, 1984, but were denied due to no one being home at the Black's residence even though the defendant had prior knowledge of Court Ordered visitation in accordance with the Pendente Lite Order for Visitation issued by the Honorable Robert Walters on December 4, 1984.

29. A third scheduled visitation on February 9, 1985 was also denied due to family members informing plaintiff that the children were afraid of him and did not want to see him, and that defendant had prior knowledge of this visitation by the February 20, 1985 Divorce Decree and the terms of the Marital Settlement Agreement.

30. A fourth visitation scheduled for the Easter weekend of April 6, 1985 was also denied for reasons of no one being home at the Black residence in Shonto, Arizona.

31. A fifth visitation was scheduled for July 5, 1985 in accordance with the Divorce Decree of February 20, 1985 and the Marital Settlement Agreement, but was denied due to no one being home again at the Black residence.

32. A sixth visitation was scheduled for October 31, 1986, but was again denied as only the baby-sitter was home, and stated that the Blacks took the Burnside children to the Arizona State Fair in Phoenix, Arizona. This visitation was ordered by the Honorable Evelyn Bradley through her Findings and Order of October 31, 1986.

33. A seventh visitation was scheduled for the weekend of December 6 - 7, 1986 but was denied again, and was scheduled in accordance with the Supplemental Visitation Plan ordered by the Honorable Evelyn Bradley on December 1, 1986.

34. An eighth visitation scheduled for the weekend of December 23 - 24, 1986 was not made. Although the plaintiff saw the children, no visitation occurred. An officer was summoned due to an argument between the plaintiff and Mrs. Black's mother, Dianna Calamity, and plaintiff further threatened Mrs. Black's father,

Trixie Calamity, over ruining his vehicles through witchcraft. The plaintiff took the youngest child, Rochelle, but upon arrival of Police Officer Robert Clitso, the child was returned to the defendant. Officer Clitso refused to permit the children to visit with their father and advised the plaintiff to leave the residence. This scheduled visitation was also ordered by the December 1, 1986 Supplemental Visitation Plan issued by the Honorable Evelyn Bradley.

35. A ninth visitation was scheduled for the weekend of January 3 - 4, 1987, but was again denied. The plaintiff saw one of the children at the window but no one answered the door. Police Officer Harrison Navajo then came and requested the plaintiff to leave since the children did not want to see him. This scheduled visitation was ordered in the Supplemental Visitation Plan ordered by the Honorable Evelyn Bradley on December 1, 1986.

36. A tenth and eleventh visitation were attempted by the plaintiff on February 7 and again on February 8, 1987, but were again denied due to no one being home at the Black residence in Shonto, Arizona. This visitation was also ordered by the December 1, 1986 Supplemental Visitation Plan ordered by the Honorable Evelyn Bradley.

37. Subsequent scheduled visitations set for the weekends of March 25 - 26, 1987; April 4 - 5, 1987; May 2 - 3, 1987; June 6 - 7, and July 4 - 5, 1987 were not attempted by the plaintiff due to his discouraged and frustrated attempts to visit his children.

38. A twelfth visitation was attempted by the plaintiff on August 7, 1987 upon an Order for Visitation issued by the Honorable Wayne Cadman, Sr. on August 4, 1987, and by previous agreement by the parties, was to have Mrs. Black bring the children to the Law Office of Gary LaRance for the plaintiff to pick up. But this visitation never occurred and Mrs. Black did not bring the children to the Law Office, and when Mr. Burnside went to the residence of the defendant, no one was home.

39. A thirteenth visitation was attempted by the plaintiff on August 14, 1987, but again no one was home and no visitation occurred. This visitation was also ordered by the August 4, 1987 order issued by the Honorable Wayne Cadman, Sr.

40. A final attempt at visitation by the plaintiff was on December 25, 1987, but due to verbal confrontation with the defendant's present husband, Roy Lee Black, the visitation did not occur. The plaintiff tape recorded this conversation and was allowed into evidence.

41. Shannon Burnside is afraid of her father because she was told by Genevieve Black he did not take care of them, he had a gun and he always hurt her mother. If she was forced to go with her father, she stated she "would rather go to jail."

42. Tom Burnside really did not know his father and is not afraid of him, and on one occasion went shopping for clothes with his father in Flagstaff, Arizona. He could not read the letter that was sent to the Social Worker but signed it when Shannon asked him to.

# CONCLUSIONS OF LAW

## I. WHETHER THE PRESENT CUSTODY OF THE THREE MINOR CHILDREN SHOULD BE CHANGED WHEN THE CHILDREN REFUSE TO VISIT A NONCUSTODIAL PARENT

There is nothing specifically stated in the Navajo Tribal Code to address the issue of a noncustodial parent's visitation right. 9 N.T.C. Sec. 404 does state that a "divorce decree shall provide for a fair and just settlement of property rights between the parties, and also for the custody and proper care of the minor children." Since there is no Navajo law, then under 7 N.T.C. Sec. 204(c), Navajo courts may apply the laws of the state in which the matter in dispute may lie. *Johnson v. Dixon*, 4 Nav. R. 108 (1983). The law of the state in this case would be A.R.S. 25-337 which states:

> A parent not granted custody of the child is entitled to reasonable visitation rights to ensure that the minor child has frequent and continuing contact with the noncustodial parent unless the court finds that visitation would endanger seriously a child's physical, mental, moral or emotional health.

This Court, while not bound by Arizona laws, may use the statute as guidance. Here, Edison Burnside, the noncustodial parent, is entitled to reasonable visitation rights with the minor children. Mr. Burnside has consistently sought to exercise his visitation rights since before the divorce and afterwards.

Generally, the question of whether to limit the visitation rights of the noncustodial parent because visitation would endanger seriously a child's physical, mental, moral or emotional health is committed to the sound discretion of the trial court but the power is to be exercised with caution and restraint. Only under extraordinary circumstances should a parent be denied the right of visitation. *Reardon v. Reardon*, 3 Ariz. App. 475, 415 P.2d 257 (1966). There is no evidence of misconduct on the part of Mr. Burnside. Neither is there evidence of any deficiency or instability in the father's home. Rather, the father has attempted to increase his time and involvement with the children by asking the Court to increase his visitation rights. See orders of December 1, 1986 and August 4, 1987.

However, the evidence shows that the children did not wish to see their father and were afraid of him. There is substantial evidence that the mother has consistently and deliberately frustrated, obstructed, and hindered the father's visitation rights, thereby seriously damaging the relationship between the children and their father. The children have rejected their father to the point where one claims that she would "rather go to jail" than be with her father. An Arizona case relied on a Pennsylvania court opinion to address the issue whether minor children should be required to visit the noncustodial parent despite their desire not to do so. That court held that the custodial parent could be directed to exercise parental authority over the minor children so as to require compliance with a visitation

order. *Sholty v. Sherrill*, 129 Ariz. 458, 632 P.2d 268 (1981), citing *Fernald v. Fernald*, 224 Pa. Super. 93, 302 A.2d 470 (1973); *Commonwealth v. Fotz*, 188 Pa. Super. 241, 146 A.2d 362 (1958). In *Fotz*, the court rejected the argument that the 13 year old child should not be forced to visit her father where the child has a strong fear of her father because it appeared he had struck and kicked the child before. The court held that the best interests of the child would be advanced by effecting a reconciliation with her father. To deny visitation rights could only lead to permanent estrangement between the child and the father. Therefore, the court held that it had the power to require the mother to exercise parental control to compel the child to visit her father.

Here, the District Court agrees with this view. Where a mother's attitude toward visitation has been a contributing factor in destroying a relationship between a child and the father, the Court will require the mother to exercise her parental control over her child and take steps to reestablish a relationship between the child and the father. Here, the mother aligned the children, specifically Shannon, against her father. Shannon then influenced her younger siblings. Shannon has the same attitude as her mother, that she won't be forced to see her father and would rather go to jail. The children were too young when the separation occurred and information on the father can only be obtained from their mother.

The children's conflicting emotions stem from the mother's attitudes rather than by any overt mistreatment by the father. There could be a beneficial visitation if the children could be assisted in ridding themselves of the stress and psychological damage. Measures should be taken to attempt to heal the wounds suffered by the children and the parents.

However, the mother persistently avoids visitation by being away from home. She does recognize the right of visitation, provided the father has "the right attitude." In her opinion, the right attitude is communicating with her and Roy Lee Black.

The alignment instilled by the mother is damaging to the moral and emotional health of the children and can be overcome by counseling. Counseling needs to include both noncustodial father and mother as well and should be more concerned about the children than their differences resulting in bitter feelings towards each other during and after the divorce. These feelings are evidenced by arguments ensuing between the parents during visitations and at times in front of the children. Children should not be left in this type of environment. Although the children's needs are provided for by the mother and removing them would be detrimental, the future of the children far outweigh the present.

It is in the best interests of the children that they be removed from the residence of the mother and be placed in the care of the Navajo Nation Division of Social Services where they can receive proper guidance and counseling. The children need to reestablish a relationship with their father before it is beyond repair. Because of the history of the mother, this goal cannot be accomplished by

leaving the children in her continued custody. This Court has continually issued warnings and orders regarding visitation which have been ignored. The Court has no choice now but to intervene and place the children in the care of the Social Services - until further notice of this Court.

## II. WHETHER A CUSTODIAL PARENT MAY BE HELD FOR CONTEMPT OF COURT FOR ALLEGEDLY MISUSING THE JOINT TENANCY TRUST ACCOUNT AS ESTABLISHED BY A DIVORCE DECREE AND FOR ALLEGEDLY INTERFERING WITH COURT ORDERED VISITATION SCHEDULES

The Navajo Nation courts have inherent power to punish for contempt. The court must always first determine whether the person's conduct constitutes contempt. A failure to obey an order of the court is contempt. *John v. Herrick*, 5 Nav. R. 129, 130 (1987). The facts show that the mother deliberately disobeyed the terms of the Marital Settlement Agreement establishing a trust fund at Valley National Bank which was to be used for the education and emergencies of the children. Withdrawals were to be made only upon consent by both parties.

On September 13, 1985, Genevieve Black proceeded to withdraw $5,076.72 from the Valley National Bank in Page, Arizona, without the consent of the plaintiff. Mrs. Black indicated that some of the money was redeposited into the Coconino Federal Credit Union in Flagstaff, Arizona, but refused to specify the amount or account number. The rest of the money was used for clothing purchases for the children but failed to produce any receipts or an itemized accounting with amounts to the present date. An Interim Order of July 27, 1988 ordered Mrs. Black to disclose how the money was used upon withdrawal and show the current balance on deposit at Coconino Credit Union no later than July 8, 1988. Mrs. Black did neither.

In addition, the mother deliberately disobeyed the Pendente Lite Order for visitation (Dec. 4, 1984), Divorce Decree (Feb. 20, 1985), Order of October 31, 1986, Supplemental Visitation Plan (Dec. 1, 1986), and Order of Aug. 4, 1987 granting the father visitation rights. The father attempted 14 scheduled visitations between December, 1984 and 1987.

There is substantial evidence that the mother disobeyed the authority of this Court and interfered with the father's visitation rights as follows: (1) by leaving visitation to the discretion of the children; (2) by refusing to answer the door when the father arrived to pick up the children; (3) by calling the Tribal Police for assistance when their presence was unnecessary and using the police to hinder visitation; (4) by refusing to exercise parental control to compel the children to visit their father; and (5) by contributing to the children's rejection of their father.

## ORDER

IT IS THEREFORE ORDERED that the said minor children shall immediately be placed in the legal custody, care, and control of the Tuba City Navajo Division of Social Services until further order by the Court.

IT IS FURTHER ORDERED that the Navajo Division of Social Services shall commence counseling sessions with both the plaintiff and defendant concerning 1) the alignment of the children against the plaintiff, 2) for visitations, and 3) parenting skills.

IT IS FURTHER ORDERED that the defendant is found to be in indirect contempt for disobeying the Marital Settlement Agreement which was incorporated into the Final Divorce Decree concerning the withdrawal of $5,076.72 on September 13, 1985; and is in indirect contempt for violating the provisions of the Interim Order issued on July 27, 1988 for failing to disclose to the Court as to how the money was used, and the current amount in the Coconino Credit Union; and that the defendant be immediately taken into custody and detained at the Navajo Division of Public Safety in Tuba City, Arizona and held until a sum of $5,076.72 is deposited into a trust account for the benefit of the three minor children with disbursements to be supervised by the Navajo Division of Social Welfare.

IT IS FURTHER ORDERED that all visitations by both parents with the minor children be supervised by the Navajo Division of Social Welfare.

IT IS FURTHER ORDERED that a review hearing shall be held within 90 days from the date of this order.